FILED
JEANNE A. NAUGHTON, CLERK

MAY - 4 2018

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____DEPUTY

**NOT FOR PUBLICATION**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
| In Re: | Case No.:    17-17221-ABA |
| Soyong Suh, | Chapter:    13 |
| Debtor. | Judge:    Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

In a bankruptcy case filed in 2008, Soyong Suh ("Mrs. Suh") and the City of Philadelphia (the "City"), settled a matter regarding the return of two parcels foreclosed on by the City in violation of the automatic stay. They memorialized their agreement in an order executed by the bankruptcy court (the "2010 Consent Order"). The City did not comply with the order, much litigation ensued, and now, nine years later, Mrs. Suh brings a Motion for Contempt in this new bankruptcy case. While the City concedes that it is in contempt for failing to comply with the 2010 Consent Order and further concedes to damages of $94,190.39 ($85,000.00 + $9,190.39),[1] it does not agree with Mrs. Suh's demand for additional damages. After an initial hearing, this court scheduled and held a plenary hearing on the damages issues. It was made clear that the plenary hearing was for the purpose of Mrs. Suh presenting all of her damages as a result of the City's contempt. The parties made their arguments, presented evidence, and rested. Then, the parties filed post-hearing memoranda supporting their positions. The matter is now ripe for consideration and the court's task here is to determine the appropriate measure of damages.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

---

[1] The City persuaded the court that a return of the real property now is not practical and counsel to Mrs. Suh confirmed that the property could not be returned through a pending state court action and otherwise did not convince this court that a return of the property was practical.

## FINDINGS OF FACT

A series of errors made by both parties brings them to the matter now before the court. To better comprehend and address the issues presented, a thorough presentation of facts is required.

### The Properties

It all started on February 14, 2006 when Mrs. Suh's parents deeded to Mrs. Suh and her husband, Charles, three vacant[2] lots located at 2145, 2147 and 2149 Federal Street, Philadelphia, Pennsylvania ("2145," "2147," and "2149", respectively, collectively, the "Properties") for $1, as well as an agreement to take care of Mrs. Suh's father for the rest of his life. Ex. D-1; Tr, p. 22;[3] Ex. C-11, p. 12. Mrs. Suh is a homemaker and Mr. Suh is a pharmacist. Ex. C-11, p. 6. The family had always treated the Properties as one rather than individual or separate lots. Tr, p.48. They planned to develop the Properties with the help of a friend, and had hired a firm to design residences on the parcels. Ex. C-11, pp. 16-21, 59-60; Tr, p. 49. The Suhs apparently believed that the three lots ran the full block back, possibly house lots with backyards. Instead, the 2149 parcel actually included the backyard of 2147, and a neighbor's adjoining lot included the backyard of 2145. C-11, pp. 54-58. The Suhs received the Properties with real property taxes due and nuisance liens. Ex. C-11, pp. 12, 15; Ex. C-42, Exs. A, E. In March 2008, the City petitioned the Philadelphia County Court of Common Pleas for an order directing the sheriff to sell 2145 and 2147 at sheriff's sale. Doc. No. 18-2, ¶ 10.

### Mr. Suh's Bankruptcy Case

Prior to a sheriff sale taking place, Mr. Suh filed a no asset chapter 7 case on July 30, 2008 through attorney David Paul Daniels. Ex. D-7 (Bankr. Case. No. 08-24242-JHW). Generally, a bankruptcy filing stays the continuation of a judicial, administrative, or other action or proceeding against a debtor and his or her property or to enforce any lien against property of a debtor. *See* 11 U.S.C.A. § 362(a). Eventually, the chapter 7 trustee abandoned the Properties on September 30, 2008, which abandonment was unopposed. Ex. D-7. Mr. Suh obtained a discharge[4] on October 31, 2008 and his case was closed on December 2, 2008. *Id.*

Despite pendency of the bankruptcy case, on October 15, 2008 the City proceeded to sheriff sale, where it purchased 2145 and 2147 for $800 each. Exs. D-8, D-9. This violated the automatic stay in Mr. Suh's case. *See* 11 U.S.C. § 362(a)(5), (c)(2)(C). Neither the Suhs nor Mr. Daniels realized the sheriff sale had occurred.

---

[2] According to Mrs. Suh, prior to her and her husband gaining ownership, the buildings on 2145 and 2147 were not livable, so the City demolished them. Ex. C-11, p. 15. Thus the parties throughout have referred to the properties as vacant lots. The deed for 2149 however describes the property as including a "three story brick messuage, two story brick stable and lot or piece of ground[.]" Exs. D-1, D-24.

[3] References to the transcript of proceedings of November 9, 2017 shall be to "Tr, p. __."

[4] Real property taxes are not dischargeable in a chapter 7, *see* 11 U.S.C. §§ 522(c)(2)(B), 523(a)(1)(A), 524(a)(3); *Johnson v. Home State Bank,* 501 U.S. 78 (June 10, 1991) (liens pass through chapter 7), thus discharge would not prevent the City from foreclosing on property after it was granted.

**Mrs. Suh's First Chapter 13 Case**

On December 5, 2008, on the heels of her husband's case closing, Mrs. Suh filed a chapter 13 bankruptcy case, Ex. D-10 (Bankr. Case No. 08-34197-JHW) (the "First Chapter 13 Case"), where she proposed a chapter 13 plan that would cure the tax arrears on all the Properties. *See* Ex. D-12, ¶ 4; Ex. C-11, p. 24 ("I was back behind taxes . . . so I filed for bankruptcy."). Her plan was confirmed on February 26, 2009. Ex. D-10, docket entry #25.

While that case was pending, in May 2009, Mrs. Suh ran a search on the Properties and discovered that the City owned 2145 and 2147. Tr, p. 25.[5] On May 7, 2010, Mrs. Suh filed a motion to vacate the sheriff sale based on the violation of the stay in her husband's case. Ex. D-12. This led to the 2010 Consent Order, wherein the parties consented, and the court ordered, in pertinent part, the following:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The City shall prepare and file deeds to reconvey properties located at 2145 and 2147 Federal St., Philadelphia, PA ("Properties") to the Debtor within sixty (60) days of the execution of this Stipulation and Consent Order.

2. If the City fails to prepare and file the deeds within such time frame, the Debtor will be entitled to file, and the City will not object to, a proposed order with the Bankruptcy Court allowing the Bankruptcy Court to vacate the sheriff's sale against the Properties.

* * *

4. This Consent Order shall be valid, enforceable and binding on all parties when entered by the Court.

* * *

6. The Court shall retain jurisdiction to hear any matters or disputes arising from or relating to this Consent Order.

Ex. D-13.

The 2010 Consent Order was entered June 7, 2010. The City did not transfer 2145 and 2147 back to the Mrs. Suh. What is more, at no time after 60 days from the order's entry did Mrs. Suh exercise her right to file an order with the Bankruptcy Court vacating the sheriff's sale against 2145 and 2147. The First Chapter 13 Case was dismissed and reinstated several times, and finally dismissed on the trustee's certification of default and over Mrs. Suh's objection. Ex. D-10.

---

[5] Some years later, Mrs. Suh would allege that that the City had advised her attorney on June 10, 2009 that 2145 and 2147 would be re-deeded to the Suhs. Ex. D-37, ¶ 17; Ex. D-47, ¶ 15. She further alleged that on October 27, 2009, a Ms. Joanne Straus of the City told her counsel that the properties would be deeded back to them. Ex. D-47, ¶ 16.

### Mrs. Suh's Second Chapter 13 Case

Just over two weeks later, on November 14, 2011, Mrs. Suh filed a new chapter 13 case. Ex. D-15 (Bankr. Case. No. 11-42851-ABA) (the "Second Chapter 13 Case"). She testified that she filed the case "to get the property back again." Tr, p. 29; *see* Tr, 32, 51. In particular, she testified that she would not have had to file this case had the City returned 2145 and 2147 in 2010. Tr, p. 32.

But this testimony is not credible. Mrs. Suh testified contradictorily that her tax debt at the time of the 2011 filing *was not* a reason for filing, and that the city tax and other debt *was* a reason for filing. *See* Tr, p. 70, 77-78. As she later alleged that her counsel had previously been advised by the City that the sheriff sales had been vacated, Ex. D-37, ¶ 54; Ex. D-47, ¶ 21, at that time she must have believed 2145 and 2147 had been returned. Moreover, the pleadings in the Second Chapter 13 Case, specifically: the Docket; Petition (acknowledging on Schedule A ownership in multiple properties and on Schedule D outstanding taxes owed to the City); Chapter 13 Plan (providing for a cure of a mortgage arrearage on her residence and payment of taxes to the City); Order Confirming Chapter 13 Plan; and the City's proof of claim (evidencing, *inter alia,* a tax obligation on an additional piece of real property in Philadelphia) reflect that there were actually other reasons why Mrs. Suh filed the Second Chapter 13 Case. *See* Ex. D-15 and C-42, exs. A, B, D, F.

During the Second Chapter 13 Case, the chapter 13 trustee objected to Mrs. Suh's expenses and held confirmation hearings, the case was dismissed and reinstated, and on November 29, 2012, the plan was confirmed that provided for the cramdown of the City of Philadelphia's tax claims. Exs. C-42, exs. B, D; Exs. D-15, docket entry #38.[6] The trustee made payments to two creditors in addition to the City, with the case failing before five unsecured creditors with filed claims were paid anything. Ex. D-26.

On January 17, 2013, the City deeded 2147 to the Philadelphia Redevelopment Authority ("PRA"). Ex. D-34. On February 22, 2013, the PRA sold 2147 along with three other properties, to JBS Renovation ("JBS") for $55,546. Ex. D-18. All deeds contained clauses requiring development of the property within one year of the transfer, else title to the premises could revert at the sole option of the City of Philadelphia (the "Reversionary Interest"). *See* Exs. D-18, D-34.

The Suhs, and/or their attorney, must have finally realized something was wrong,[7] as on March 20, 2013 Mrs. Suh filed a Motion to Compel Turnover of Real Estate, on May 13, 2013 she

---

[6] The City filed a proof of claim alleging $15,121.43 in taxes owed on 2149, and certified that Mrs. Suh owed $8,330.99 in taxes on 2145. Ex. C-42, exs. F, G.

[7] The Suhs later allege that their attorney was not made aware of the status of the Properties until May 2013. This makes no sense considering, as the Suhs stated in the same complaint, that Mr. Daniels filed a Motion to Compel Turnover of Real Estate in March 2013, unless "May" was a typo. Ex. D-37, at ¶ 58. *See* Ex. D-15, docket entry no. 41.

filed a Motion for Injunctive Relief, and on May 21, 2013 she and her husband filed an Adversary Proceeding[8] against the City and JBS. Exs. D-15, D-19 (Adv. Proc. No. 13-1504-JHW).

On June 18, 2013, the court entered an Order Compelling Turnover of Real Estate that provided in pertinent part:

> ORDERED that the sale conducted by the Sheriff of Philadelphia County on October 15, 2008, on the property located at 2145 Federal St., Philadelphia, PA . . . is VACATED; and it is . . .

> FURTHER ORDERED that within sixty (60) days of the entry of this Order, the City shall record a deed of correction, from the City to Charles and Soyong Suh, with a copy of this order attached, [that] acknowledges [that] the sale of the Property on October 15, 2008, is vacated and that the Sheriff's Deed is invalid and of no force or effect . . . ; and it is

> FURTHER ORDERED that should the City fail to record a deed of correction within sixty (60) days of the entry of this Order, the Debtor may cause a deed of correction to be recorded and all reasonable costs associated with the recording of a deed of correction may be deducted from any claims of the City against the Debtor; . . . .

Ex. D-17. As to 2147, the court ordered that an adversary complaint be filed, *id.*, though it appears that had already been done.

This time, the City complied: it issued a Deed of Correction as to 2145 on August 15, 2013. Ex. D-14. It is not known what the parties decided to do about 2147 though, as on August 8, 2013, after the City answered the complaint and filed a counter-claim, the court entered a Consent Order Dismissing Adversary Complaint Without Prejudice. Ex. D-19. That same day, the Suhs sold 2149 to 2149 Federal Street LLC for $79,116.92 with the assistance of attorney Jay Edelstein, a friend of Mr. Suh. Ex. C-11, p. 56; Ex. D-24; Tr, at 66.[9] Mrs. Suh identified Ori Feibush as the person behind 2149 Properties, LLC. Tr, p. 60; Ex. C-11, p. 44.

According to Mr. Daniels's fee disclosure filed in the Second Chapter 13 Case, Mrs. Suh was charged $281 for the filing fee, plus $3,500 in legal fees for basic bankruptcy efforts, exclusive of representation in adversary proceedings and other extra services. Ex. D-25. Instead, those services were to be provided at a rate of $400 per hour. *Id.* But no fee application for additional services was ever filed. Ex. D-15.

---

[8] This may have been to correct the procedural error of filing a motion when injunctive relief must be sought by adversary proceeding. Fed. R. Bankr. P. 7001(7). On July 8, 2013, Mrs. Suh withdrew the Motion for Injunctive Relief. Ex. D-15.

[9] Neither Mr. Edelstein nor the Suhs realized that 2149 included part of what they thought was 2147. Ex. C-11, p. 56.

During the case, the chapter 13 trustee received $6,060 in payments from Mrs. Suh. Ex. D-26. The trustee distributed $5,478.84 to creditors and administrative claimants, and $281.16 to herself for the trustee commission, and refunded $300 to Mrs. Suh. *Id.*

On August 29, 2013, Mrs. Suh's Second Chapter 13 Case was dismissed for failure to make plan payments. Ex. D-15.

### The Suh's Philadelphia Actions

The Suhs' next move was to sue the City, PRA, the Sheriff of Philadelphia, JBS, and Mr. Daniels, in the Philadelphia County Court of Common Pleas (the "Philadelphia Action"). Ex. D-37. The Suhs again used the services of attorney Edelstein. *Id.*

Count I, lodged against the City, the sheriff, and PRA, sought an order conveying 2147 (already sold to JBS) back to the Suhs, and damages of $50,000 from the City, plus punitive damages, attorneys' fees and costs. *Id.* Within that count and incorporated into the other counts, the Suhs alleged that in June 2009, the City indicated that 2145 and 2147 would be re-conveyed to them. *Id.*, ¶ 17. The Suhs also alleged both that 2145 and 2147 were sold at sheriff's sale, ex. D-37, ¶¶ 15, 51, and yet also asserted that 2147 "was removed from Sheriff Sale" prior to being sold by the City, through the PRA, to JBS. Ex. D-37, ¶ 25. Count II accused the same defendants of negligence and sought the same relief. *Id.* In Count IV, the Suhs sought a declaratory judgment that the sale of 2147 to JBS was "invalid" because JBS knew or should have known that the property belonged to the Suhs. *Id.*, at ¶¶ 73, 74.

In Count III the Suhs alleged that attorney Daniels committed legal malpractice. First, they alleged that Mr. Daniels' failure to object to the chapter 7 trustee's abandonment of the Properties in Mr. Suh's bankruptcy case caused the Properties to be removed from the protection of the bankruptcy stay. *Id.*, at ¶¶ 48-50. This contradicts Mrs. Suh's allegation that the City violated the stay in Mr. Suh's case when it proceeded to sheriff sale during that case, but also is an incorrect assertion of bankruptcy law. The automatic stay protects property of the estate as well as property of the debtor from certain actions. After abandonment from the estate, the stay still protects property of the debtor from enforcement of a lien that arose prior to the bankruptcy filing. 11 U.S.C. § 362(a)(5). *In re Siegel*, 14-10267 (MG), 2014 WL 3360573, at *2 (Bankr. S.D.N.Y. July 9, 2014) ("If the property has been abandoned to the Debtor, Cinfiors is prevented from 'act[ing] to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under [the Bankruptcy Code]'" under § 362(a)(5)."). *See Collier on Bankruptcy*, ¶ 362.03[7] (Matthew Bender 16th ed. 2018) (section 362(a)(5) protects property that has been abandoned by the chapter 7 trustee).

The Suhs then alleged that Mr. Daniels failed to confirm that the City returned 2145 and 2147, instead relying only on the City telling him that it did, when he could have filed a proposed order with the bankruptcy court to vacate the sheriff's sales against the properties pursuant to the 2010 Consent Order. *Id.*, at ¶¶ 53-55. Thus, when he filed the Second Chapter 13 Case for Mrs.

Suh in 2011, he disclosed that she owned 2145, 2147 and 2149. *Id.*, at ¶ 57.[10] They alleged that it was not until May 2013[11] that Mr. Daniels learned that the City was still in possession of 2145 and no longer in possession of 2147. *Id.*, ¶¶ 59-61. The Suhs alleged that they relied on the representations and advice of Mr. Daniels to their detriment, resulting in losing 2147 and being deprived of the full value of ownership of 2145. *Id.*, at ¶¶ 63-69.

By order dated June 3, 2014, the Common Pleas court sustained preliminary objections made by all of the defendants except JBS,[12] and dismissed the complaint against those parties for lack of subject matter jurisdiction. Ex. D-38. Because the Suhs appealed that order, the Common Pleas court then issued a written opinion, dated August 26, 2014, setting forth its reasons for its decision. *See* Ex. D-39. The court stated that all of the issues in the complaint emanated from the 2010 Consent Order, and that the bankruptcy court's retention of jurisdiction in that order vested it "with jurisdiction over all matters emanating from this order." *Id.*, p. 7. It also noted that the jurisdiction retention reflected the parties' agreement to litigate its enforcement in the bankruptcy court. *Id.*

The Suhs then incorrectly appealed to the Superior Court of Pennsylvania, when the proper venue was the Commonwealth Court of Pennsylvania (with the Philadelphia Action, the "Philadelphia Actions"). *See* Exs. D-39, p. 6 n. 7, D-40, and D-42, p. 2 n.1. Then, the Commonwealth Court denied their appeal on the finding that the lower court's order was interlocutory, the lawsuit not having concluded against JBS. Ex. D-42. The court explained that, to try to get around the interlocutory issue, the Suhs had dismissed their original Common Pleas case against JBS only to turn around and file a new case against it, Ex. D-43, litigation moves the Commonwealth Court described as a "device" that was "nothing more than a transparent attempt to make an end run around Rule of Appellate Procedure 341." *Id.*, at p. 2. It accordingly quashed the appeal for lack of appellate jurisdiction. *Id.*, p. 3.

Mrs. Suh contends that she still owes Mr. Edelstein for attorney fees and costs for his work in the Philadelphia Actions. She asserts that she was billed $2,991.83 by Mr. Edelstein for this work. Tr, p. 38. Though she testified that she had a fee agreement with Mr. Edelstein, she did not bring any such agreement with her to court. Tr, at 66. She does not have a receipt, copy of a check, or any other type of record evidencing that she paid Mr. Edelstein. Tr, p. 67. She also testified that she had only paid Mr. Edelstein "partially," though did not specify that amount. Tr, p. 66. She testified that "Jay Edelstein is a friend of my husband's. And at the time I was having financial

---

[10] Of course, as debtors sign the schedules under penalty of perjury, they are ultimately responsible for the accuracy of their schedules, with reliance on the advice of counsel no defense when the truth should be evident to the debtor. *In re Crest By The Sea, LLC*, 522 B.R. 540, 549-50 (Bankr. D.N.J. 2014).

[11] As stated above, this makes no sense considering unless "May" was a typo. Mr. Daniels would not have filed a motion to compel turnover of property in March if he still believed the City had previously returned it.

[12] According to the decision, JBS answered the complaint and counter-claimed a lack of subject matter jurisdiction. Ex. D-39, p. 3.

problems, so he was helping out." *Id.* Mrs. Suh conceded that as of the time of the plenary hearing, Mr. Edelstein had not initiated any collection action against her. Tr, at 67.[13]

Mrs. Suh then hired attorney Emeka Igwe to file a bankruptcy case for her. Tr, 40. She alleges that she paid Mr. Igwe $3,000 and then an additional $2,000 for this service, though she had no receipts evidencing this. Doc. No. 55, p. 10; Tr, p. 40. Moreover, Mr. Igwe never filed a bankruptcy case on her behalf. Tr, p. 66.

On May 4, 2016, some eight years after 2147 had been wrongly conveyed to the City and still not returned, the Suhs sold 2145 to Easy Property Holdings, LLC, for $77,500. Ex. D-23.

### The 2016 Quiet Title Action

By a complaint dated May 26, 2016, JBS commenced an action in quiet title against the Suhs in the Court of Common Pleas, Philadelphia County. Exs. D-22, D-45 (the "Quiet Title Action"). Therein it seeks a declaration "that it is a bona-fide purchaser for value without notice of any defect and that its title to the Property is free and clear of any claim by the Suhs." Ex. D-45, ¶ 19. The Suhs are represented in that matter by attorney Jenny R. Kasen, who also represents Mrs. Suh in this bankruptcy case. Exs. D-22, D-54. Regarding the Quiet Title Action, Ms. Kasen represented to the court:

> MS. KASEN: While it's my professional opinion that the Suh's have a valid defense to JBS's quiet title claim, I do not believe that the Suh's have a valid counterclaim for quiet title against JBS. And I also don't believe that the Suh's have any other valid legal theory that they can use in the 2016 State Court case to recover 2147 from JBS, or any money damages from JBS.

> THE COURT: So in your expert opinion, as you said, 2147 never could be returned through the State Court?

> MS. KASEN: That's correct. That's my opinion.

Tr, p. 13. Thus it is not clear why the matter is still pending, except to the extent stayed by this bankruptcy filing.

### Mrs. Suh's Third Chapter 13 Case

On April 10, 2017, Mrs. Suh filed the present chapter 13 case (the "Third Chapter 13 Case"). Exs. D-22, D-54. Mrs. Suh testified that she filed this case to get 2147 back. Tr, pp. 43-

---

[13] The City asks the court to conclude that Mrs. Suh owes no debt to Mr. Edelstein citing that she did not disclose any debt owed to Mr. Edelstein in any of her bankruptcy cases, and that he did not file a proof of claim. (Of course, if he was not scheduled, he would not have notice of the filing of the case to know to file a proof of claim.) At the hearing, the City asked Mrs. Suh "Was any debt to the Edelstein Law Group part of your proof of claim that you filed with respect to any of your bankruptcy actions?" and "Well do you know if Edelstein has filed a proof of claim?" Tr, p. 67, and answered "no" to each question. But the first question wrongly referenced a proof of claim, rather than asking whether Mrs. Suh disclosed the debt in this case, and Mrs. Suh's answer of "no" to the second question could mean only that she does not know whether Mr. Edelstein filed a proof of claim in this case.

44. *See* Doc. No. 55, pp. 11-12 (arguing that Mrs. Suh filed this case "with the *sole* objective of trying to recover the 2147 Federal Street property.") (emphasis in original).

On May 9, 2017, Mrs. Suh filed the Motion for Contempt against the City that is the subject of this decision. Doc. No. 18. Mrs. Suh sought a total of $353,415.02 in damages, plus the value of the profits she believed she would have realized from developing the parcels and the value of the damage done to her credit rating. *Id.*, p. 14. After deposing Mrs. Suh, Ex. C-11, the City filed a response to the motion on August 22, 2017. Doc. No. 32. Therein, the City conceded that it was responsible for the debtor's loss of 2147, but maintained that the relief sought was overstated. *Id.*, p. 2. On August 28, 2017, Mrs. Suh filed a Supplemental Certification in Support of her motion, breaking down the damages into its components. Doc. No. 37. She no longer sought damages for lost profits, but added a claim for damages based on the higher amount she could have obtained selling the three parcels together versus selling them one at a time ("Lost Bulk Sale Opportunity").

In sum, Mrs. Suh requests the following damages:

| Description | Damages |
|---|---|
| Fair market value of 2147 Federal Street | $85,000.00 |
| Lost Bulk Sale Opportunity | $68,967.00[14] |
| 2011 chapter 13 case Legal Fees | $3,500.00 |
| 2011 chapter 13 case Filing Fee | $281.00 |
| 2011 chapter 13 case Trustee Commissions | $281.83 |
| 2014 and 2015 State Court Matters - Legal Fees and | $2,991.83 |
| 2016 State Court Matter - Legal Fees and Costs | $9,190.39 |
| Legal fees paid to Emeka Igwe, Esq. | $5,000.00 |
| Valbridge Expert Fees through to 11/8/17 | $8,341.25 |
| Valbridge Expert Fees for 11/9/17 hearing @ $300/hr. | $1,890.00 |
| 2017 chapter 13 case - Costs through to 11/6/17 | $2,387.07 |
| 2017 chapter 13 case - Costs 11/6/17 to present | $598.82 |
| **Sub-Total:** | **$188,428.52[15]** |
| 2017 chapter 13 case - Legal Fees (30%) | $56,528.56[16] |
| **Total Recoverable Damages to Date:** | **$244,957.08[17]** |

As noted, the City conceded to damages for the loss of 2147 in the agreed fair market value amount of $85,000. It also conceded to damages of $9,190.39 representing the legal fees and costs expended so far by the Suhs to defend against the Quiet Title Action. Tr, pp. 16-17; Doc. No. 32, pp. 16, 19. The court divides the remainder of the damages sought by Mrs. Suh into two categories: Attorneys Fees and Costs and Lost Bulk Sale Opportunity.[18]

On November 9, 2017, this court held a plenary hearing on all damages. Regarding the Lost Bulk Sale Opportunity damages, Mrs. Suh admitted into evidence an appraisal report prepared by Valbridge Property Advisors, ex. D-31 (the "Valbridge Report"), and presented testimony of Reaves C. Lukens, III, one of the appraisers that prepared the report. Mr. Lukens explained that he

---

[14] By Debtor counsel's own numbers, this number is miscalculated. It's actually $68,907.00. *See* Doc. No. 55, fn.4.
[15] This should be $188,368.52.
[16] This should be $56,510.56.
[17] This should be $244,879.08.
[18] Mrs. Suh's asserted claim for damages related to her credit rating is discussed below.

used the sales comparison approach to estimate the value of each of the parcels as of April 26, 2017. Tr, p. 100.

Because prior to April 2017, 2149 had been subdivided into two lots (creating 2146 Annin Street, Ex. D-31, p. 1), Mr. Lukens provided value estimates for the parcels as four individual lots, totaling $385,000. Tr, p. 97; Ex. D-31, p. 31. The parcels were valued as though unimproved as of the date of value, two single-family homes having been constructed on 2149 since its sale in 2013, and one currently under construction on 2145. Ex. D-31, pp. 1, 5. The parcels are zoned "residential Single-Family Attached-5," which includes single-family, passive recreation, family day care, religious assembly, safety services, transit station, community garden, market/community farm." *Id.*, p. 14.

Mr. Lukens concluded that the Suhs would have been able to sell the four lots for (at least) 20 percent more than selling them individually, a $77,000 addition. Tr, p. 99. He added the $85,000 appraised value of 2147, and subtracted out the cost of subdivision, which he estimated at $2,100, as well as selling expenses of $5,993.[19] *Id.* Mr. Lukens rounded the $153,907[20] loss up to $155,000. *Id.*; Ex. D-31, p. 32.

The Valbridge Report stated that there is a market for single family residences in Point Breeze. "Businesses continue to move into the area and investors continue to look for opportunities in the expanding markets. Secondary markets that surround Center City, including the subject neighborhood, have shown signs of gentrification in recent years and these trends are expected to continue into the near future." Ex. D-31, p. 8. The Valbridge Report also stated "The Subject neighborhood has experienced an increase in new construction projects over the last several years. This includes apartments, rowhomes, and townhomes." Ex. D-31, p. 11. Though this could mean more supply than demand, Valbridge concluded otherwise: "The demand for residential properties has increased over the last several years in the subject neighborhood, which is evident based on the steady increase of new construction and home prices. The subject's site is well positioned for development." Ex. D-31, p. 12. The appraisal also shows an increase from no new construction projects in 2008 or 2009, two in 2010 and five in 2011, to 40 in the second quarter of 2017 alone. Ex. D-31, p. 11. The City's expert, Albert R. Hughes, III, did not object to this characterization of Point Breeze.

In addition, Mr. Lukens credibly testified, and Mr. Hughes did not refute, that Point Breeze has ". . . become a very desirable place to live. You see a significant uptrend in development from 2008 through 2017. And it's just become a very, very popular area for residential development." Tr, pp. 101-02. Mr. Hughes did not voice disagreement with this assessment, thus the court has no basis to discount it.

Mr. Lukens testified that he obtained the 20 percent premium from discussions with developers. "We interviewed developers. They indicated that that was a reasonable range on projects like this." Tr, p. 118. He explained that having several contiguous lots at once is desirable for developers because the cost of development is lower.

---

[19] Which results in a final amount of $68,907 for the Lost Bulk Sale Opportunity ($77,000 - $2,100- $5,993).

[20] $85,000 + $68,907=$153,907.

But the Suhs, had they been able to sell all four lots, a developer would have been able to achieve significant economies of scale in the development. Right now, with the intervening lot missing, when the people come out and excavate the site, or bring the lumber, or do all that, there's no economies of scale to the development. Had they been able to come out and excavate all at once, it would have been significantly cheaper and easier. If they'd been able to pour the foundations all at once, significantly cheaper and easier. Bring the framers out at one time, significantly cheaper and easier. And all of these things add value to the site. And the Suhs, by losing the middle lot, lost that opportunity to sell it to somebody who could have achieved those economies of scale. The reason you see so many kind of lots around the City that aren't being redeveloped on the infill lots, is because the costs are so much higher to do the infill lot development.

Tr, pp. 97-98. He continued:

I mean, you have to work in between two existing structures. When you excavate you have to make sure you don't do something that undermines the foundation next door. It's just a — it's a much more expensive way to develop. You can get a lot more economies of scale, you can get much greater staging opportunities. You know, one of the — the engineer was talking about how much easier storm water management would be when you're doing all of the lots, as opposed to just a footer, an 18 foot wide lot to be able to do it in one fell swoop, all of those things add up to increased profits, and developers will pay more for land when they can get those opportunities.

Tr, pp. 100-101.

Mr. Lukens testified that various developers told him that they would pay 20-30 percent more for contiguous lots.

We looked at the value of the individual lots, and we only used the value of the individual lots to consider the lot premium that would have been achieved from being able to sell them all together. And in this, we talked to developers of — residential developers on what kind of premiums they would pay for the ability to do multiple lots, versus do one at a time.

And we were getting numbers like 20 to 30 percent on a premium for the — the four-lot project, as opposed to one infill lot.

Tr, P. 98.

The City's expert, Mr. Hughes, testified instead that any cost savings from development accrues to the builder:

It's the same concept as if you go to Costco and you buy in bulk, you don't pay retail price plus 20 percent, you pay some wholesale price less than retail. Well in real estate it works the same way.

Tr, p. 143.

In addition, he complained about Valbridge's 20 percent figure:

The 20 percent number was not supported. There was no evidence on where it came from, which is required. We have to show where we got those numbers from, we can't make them up. If we survey somebody, we need to list the people that we surveyed in the appraisal, so we know where that came from. . . . You prefer to get it from the market.

Tr, p. 139. He continued:

Appraisers are mirrors, we're supposed to reflect the market. And so what we do is, is we put into our appraisal where we got the information to support it. For example, in this appraisal there are comparable sales that are used to support the lot values. That's the support. There's your adjustment grid. That's how you got there. You've walked your reader through there. You've come up with your retail lot value. Mr. Lukens' appraisal does that well. He's concluded to a value that's credible. And as a reviewer, I say I could disagree with the value, but he did his job in coming up with a lot value. In terms of the 20 percent premium, there's no evidence or support for where that came from. It just doesn't work.

Tr, p. 140.

Valbridge charged $8,341.25 to prepare the report and testify at the hearing. Ex. D-49. Mrs. Suh had so far paid $6,000 of that amount. *Id.*; Tr, pp. 46, 87. Mr. Lukens testified that Valbridge charged $6,000 for the initial report, then, using the same data, it revised the report to clarify the Lost Bulk Sale Opportunity damages. Tr, p. 102-03, 105. He also removed a lost profits analysis, as well as developer's profit and entrepreneurial incentive and two comparable sales. Tr, p. 103-05.

Mr. Hughes prepared an Appraisal Review of the Valbridge Report, i.e., an opinion of the Valbridge Report. Ex. C-3.[21] He did not inspect the appraised property or the comparables, and did not prepare a separate value opinion. *Id.*, p. i. He points out some inconsistencies in the report, for example reporting a 20 percent cost savings from developing four lots together as well as a 20 percent "incentive," *id.*, p. 13, that appear to have been clarified through Mr. Lukens' testimony.

---

[21] The report is dated October 3, 2017 and appears to have been done prior to revision of the Valbridge Report, as it includes comments on the lost profits analysis. *See, e.g.*, p. 11.

# DISCUSSION

Before addressing the two categories of damages, the court must first address its ability to assess contempt damages as well as the application of the mitigation of damages.

## A. Contempt

A bankruptcy court's power to enter sanctions for civil contempt arises from 11 U.S.C. § 105(a). *In re Walters*, 868 F.2d 665, 670 (4th Cir. 1989); *In re Vaso Active Pharm., Inc.*, 514 B.R. 416, 421 (Bankr. D. Del. 2014). Sanctions pursuant to section 105(a) include monetary damages, as well as "other relief as necessary and appropriate to prevent such abuse." *In re Santana*, 12-36802/JHW, 2013 WL 1498278, at *3 (Bankr. D.N.J. Apr. 10, 2013) (internal quotation omitted). Actual damages, including attorneys' fees, may also be awarded. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 249 v. W. Pennsylvania Motor Carriers Ass'n*, 660 F.2d 76, 84 (3d Cir. 1981), *abrogated on other grnds, Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Engineers, Local Union No. 66*, 580 F.3d 185, 189 (3d Cir. 2009); *In re Baker*, 195 B.R. 309, 321 (Bankr. D.N.J. 1996).

Damages are available in civil contempt proceedings "to compensate for losses sustained by the [contemnor's] disobedience." *Robin Woods Inc.*, 28 F.3d 396, 400 (3d Cir. 1994). A compensatory award seeks "to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed." *Id.* (citation omitted). "They are, for damages in civil contempt, the amount of injury proven and no more. . . ." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 377 (1947). "Like all awards for civil damages, the purpose of compensatory civil contempt damages is to make the plaintiff whole." *Principles of Remedies Law* (Weaver, Shoben, Kelly, 3rd ed. 2017). Contempt damages "must not exceed the actual damages caused the offended party by a violation of the court's order." *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 975 (3d Cir. 1982). Because here, a return of 2147 to Mrs. Suh is not practical, the court will consider monetary damages to make her whole.

Contempt damages may include an award of attorneys' fees incurred in connection with the contempt proceedings, as "[o]nly with an award of attorneys' fees can [the injured party] be restored to the position it would have occupied had [the contemnor] complied with the [court order in question]." *Robin Woods Inc.*, 28 F.3d at 400; *see also Quinter*, 676 F.2d at 975 (noting the relief granted in civil contempt proceedings "usually takes the form of a fine in the amount of the damages sustained by petitioner and an award of costs and attorney's fees").

The burden of proof is on a plaintiff to prove its damages. *BCS Servs. v. Heartwood, 88, LLC*, 637 F.3d 750, 760 (7th Cir. 2011); *Crusto v. Amalgamated Clothing Workers of Am. (AFL-CIO)*, 524 F. Supp. 130, 134 (E.D. La. 1981); *Jackson v. Wenzel*, 282 F. Supp. 357, 359 (E.D. Wis. 1968) ("As is well established, the burden of proof in civil actions for money damages is on the plaintiff, and that means that he must prove each essential element of his claim by a preponderance of the evidence."). The evidentiary standard "for contempt damages is not settled in the Third Circuit." *Cardionet, LLC v. Mednet Healthcare Techs., Inc.*, 146 F. Supp. 3d 671, 692 (E.D. Pa. 2015). But "those federal Courts of Appeals that have considered the issue have uniformly held

contempt damages need only be established by a preponderance of the evidence." *Id.*, at 693. This court will follow *Cardionet* in applying a preponderance of the evidence standard.

In her post-hearing brief, Mrs. Suh notes the following:

> Importantly, the following damages do not include: (i) the service costs of this Supplemental Brief; (ii) the damage to Mrs. Suh's credit score as a result of her multiple bankruptcy filing (*see e.g.*, Suh Ex. 32; Suh Ex. 33); and (iii) the prospective attorney fees that will *necessarily* be incurred to bring the 2016 State Court Action to conclusion.

Doc. No. 55, p. 4 n.1 (emphasis in original).

Though not clearly stated, the court believes that this means Mrs. Suh no longer seeks the credit rating damages, but still intends to seek the service costs and Quiet Title attorney fees. If the court is incorrect regarding the credit score damages, its discussion, below, regarding the lack of need to file additional bankruptcy cases to enforce the 2010 Consent Order and duty to mitigate damages will apply to negate any injury to Mrs. Suh's credit rating, not to mention that Mrs. Suh admitted that she does not know what her credit score was prior to any of her bankruptcy filings. Tr, pp. 53-54, and there was actually no evidence to corroborate this damage. Importantly, Mrs. Suh was aware of the purpose of the plenary hearing and had the opportunity to present evidence of this damage. Indeed, she submitted evidence of credit scores, but not of damage. The City was successful in drawing this out. Tr, pp. 51-54. Moreover, there was no bifurcation of the hearing to consider those damages apart from the other alleged damages[22] and there was no reservation of rights in regard thereto. A unilateral assertion in a post-hearing brief does not alter this fact. Consequently, the court cannot consider damages related to her credit rating and Mrs. Suh is estopped from pursuing such damage claims.

## B. Mitigation

The court asked both parties to address in their post-hearing briefs whether either party failed to mitigate damages. Though the goal of contempt damages is to make the injured party whole, this ambition is not without limits. Here, both parties allege that the other breached the terms of the 2010 Consent Order by failing to take action thereunder. Thus, both parties had a duty to mitigate damages. As stated in *Ingraham v. Trowbridge Builders*, 297 N.J. Super. 72 (App. Div. 1997):

> "It is well settled that injured parties have a duty to take reasonable steps to mitigate damages." *McDonald [v. Mianecki]*, 79 N.J. [275], 299, 398 A.2d 1283 [(1979)]. Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts "without undue risk, burden or humiliation." *Restatement (Second) of Contracts*, Section 350(1), (2) (1981).

The *Restatement* provides some guidance on when the duty to mitigate begins:

---

[22] The only matter to be bifurcated was the issue of the allowance of Kasen & Kasen's fee.

> Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected . . . to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise. . . . The amount of loss that he could reasonably have avoided by . . . making substitute arrangements . . . is simply subtracted from the amount that would otherwise have been recoverable as damages.

[*Restatement (Second) of Contracts,* Section 350, comment b (1981)].

The *Restatement* further provides how much time the injured party has to make substitute arrangements:

> The injured party is expected to arrange a substitute transaction within a reasonable time after he learns of the breach. . . . The injured party may, however, make appropriate efforts to urge the repudiating party to perform in spite of his repudiation, and these efforts will be taken into account in determining what is a reasonable time.

[*Restatement (Second) of Contracts,* Section 350, comment f (1981)].

However, "the burden of proving facts in mitigation of damages rest[s] upon the party breaching the contract." *Cohen v. Radio–Electronics Officers,* 275 N.J. Super. 241, 262, 645 A.2d 1248 (App. Div. 1994); *see also Sommer v. Kridel,* 74 N.J. 446, 457, 378 A. 2d 767 (1977) (wherein the Court stated, "generally in contract actions the breaching party has the burden of proving that damages are capable of mitigation"). Furthermore, it has been held,

> that (w)here both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to . expect a defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff. . . . The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform the contract has equal opportunity for performance and equal knowledge of the consequences of the performance.

[*Toyota Industrial Trucks U.S.A, Inc. v. Citizens Nat'l Bank of Evans City, et al.,* 611 F.2d 465, 471 (3d Cir. 1979); *see also Fiat Motors of North America, Inc. v. Mellon Bank, N.A.,* 827 F.2d 924, 930 (3d Cir. (1987)); *Edward M. Crough, Inc. v. Dep't of Gen. Services of the District of Columbia,* 572 A.2d 457, 467 (D.C. 1990) ].

Whether or not a plaintiff's efforts to mitigate his or her damages are reasonable "is a question for the trier of fact." *Higgins v. Lawrence,* 107 Mich. App. 178, 309 N.W.2d 194, 196 (1981). Thus, the proper standard in a non-jury case regarding the judge's decision on mitigation of damages "is whether the judge's findings are supported by sufficient, credible evidence in the record." *Fanarjian v. Moskowitz,* 237 N.J. Super. 395, 406, 568 A.2d 94 (App. Div. 1989).

*Id.,* at 82-84. *See also Sempra Energy Sols., LLC v. Exec. Campus, LLC,* No. 1:10-CV-02060-RBK-JS, 2012 WL 503736, at *5 (D.N.J. Feb. 15, 2012) (*citing Ingraham,* 297 N.J. Super. at 85) (there is a duty to mitigate and "the party that breaches a contract bears the burden of proving that the non-breaching party failed to make reasonable efforts to mitigate its damages.").

The City argues that Mrs. Suh failed to mitigate her damages by failing to file an order to vacate the sheriff's sale against the properties after the City failed to return the properties. The 2010 Consent Order provided that "If the City fails to prepare and file the deeds within [60 days], the Debtor will be entitled to file, and the City will not object to, a proposed order with the Bankruptcy Court allowing the Bankruptcy Court to vacate the sheriff's sale against the Properties." The City characterizes the 2010 Consent Order as giving the City a "designated time in which to act" and argues that Mrs. Suh should have exercised her remedy "after the City's period for acting lapsed." Doc. No. 56, p. 15.

Meanwhile, Mrs. Suh argues that she did mitigate her damages by employing Mr. Daniels to try to get the properties back. She further asserts that the City failed to mitigate its damages to her by not exercising its reversionary interest in 2147. Further, the City created additional damages by arguing in the Philadelphia Action that the transfer to JBS was in good faith and could not be vacated, and that the court lacked subject matter jurisdiction over the matter due to the jurisdiction retention provision contained in the 2010 Consent Order.

The court concludes that the parties met their respective burdens with regard to mitigation of damages. First, this court rejects that the City could not have transferred 2147 back after 60 days. To so find would suggest that the City could have faced additional damages for doing later what it failed to do on time. Moreover, the court does not read Mrs. Suh's "entitle[ment] to file" an order vacating the sheriff's sale as an exclusive remedy. *See United Cent. Bank v. Bhavani Fruit & Vegetable LLC,* A-0837-14T3, 2016 WL 715660, at *3 (N.J. Super. Ct. App. Div. Feb. 24, 2016) (failure to pursue rent receivership was not a failure to mitigate, as was only one of several options upon default). Mrs. Suh and the City had the same opportunity to mitigate the damages under the terms of the 2010 Consent Order as far as either preparing and filing the deeds or filing a proposed order vacating the sheriff's sale.

That neither of them did is because neither Mrs. Suh, her attorney, nor the City's attorney, seemed to know that the transfer had not taken place. The City could have confirmed that the transfer occurred (or did not occur) just as easily, if not more easily since it was the primary entity responsible for acting, than Mrs. Suh or her attorney. *Indep. Cmty. Bank v. Olympia Mortgage Corp.,* 17 Misc.3d 1109(a), 2007 NY Slip Op 51896(U), 4, at *4 (N.Y. Sup. Ct. 2007) ("Here, Olympia's own employees perpetrated the wrongdoing and, thus, it was not only in the best

position to discover their wrongdoing, but is charged with their conduct. The perpetrator of a fraud cannot assert its own agent's misconduct as a defense to repaying its contractual debt by claiming that its victim should have been more circumspect in catching it[.]"). Damages will not "be reduced on account of damages the defendant could have avoided as easily as the plaintiff." *Ingraham*, at 85-6. Here, both parties could have determined that the transfer did not take place, and then remedy that well before the City's transfer of 2147 two and a half years later. Neither party can claim innocence based on the other party's guilt.

Mrs. Suh also argues the City could have mitigated its damages by exercising its reversionary interest. But Mrs. Suh did not address how JBS could develop the property while the Quiet Title Action is pending. If it did so and then lost the Quiet Title Action, the Suhs might have a lawsuit against JBS. In addition, the City's exercise of the reversionary interest might reduce its damages to Mrs. Suh but would likely invite a lawsuit from JBS. *See Chapman v. Bowers*, 180 Okla. 49 (1937) (". . . it is well settled that if development is prevented by the conduct of the lessor or his grantee in attacking the lessee's title, the duty to develop is held in abeyance during that time and the defendant will be allowed a reasonable time thereafter within which to comply with the terms of his lease"). All parties would just be exchanging one lawsuit for another. Mrs. Suh's argument confuses mitigation of the City's damages *to her* with the City's damages overall.

Regarding the City's prolonging arguments in the Philadelphia Action, the Philadelphia court agreed that it lacked subject matter jurisdiction. The City cannot be faulted for making that argument. As for whether its transfer to JBS was in good faith or not, Mrs. Suh did not show that this argument extended the proceedings, or cost her in any way.

As for Mrs. Suh's mitigation efforts, suffice to say that three unsuccessful attempts to recover the property constitutes a failure to mitigate. No damages will be awarded in connection with the Second Chapter 13 Case, the Philadelphia Actions, or Mr. Igwe. The court particularly points out that Mr. Edelstein brought suit in a court lacking subject matter jurisdiction, then compounded the error by bringing a procedurally faulty appeal (yet again in the wrong court). *See Lohman v. Duryea Borough*, 574 F.3d 163, 167–68 (3d Cir. 2009) ("We noted in *Washington* the 'settled principle . . . that counsel fees should only be awarded to the extent that the litigant was successful.'") (quoting *Washington [v. Phila. County Court of Common Pleas]*, 89 F.3d [1031] at 1042 [3d Cir. 1996]). It would be unreasonable to award Mrs. Suh damages for her professional's ill-fated and misguided attempts to get 2147 back.

Likewise, Mr. Igwe did nothing. Mrs. Suh argues incredibly that "The mere fact that Emeka Igwe, Esq. did not end up filing a bankruptcy case for Mrs. Suh is of no consequence. Indeed, Emeka Igwe's inaction was not entirely improbable." Doc. No. 55, p. 11. This is nonsense. Additionally, if Mrs. Suh did in fact pay Mr. Igwe $5,000 for services he did not perform, her recourse is against him, not the City. The City should not have to pay for Mrs. Suh's missteps in this regard. Also, as noted by the City, because the invoice, attempted to be admitted into evidence by Mrs. Suh, did not include any breakdown of services, the court would not be able to determine the reasonableness of the charges. Since Mrs. Suh admitted that Mr. Igwe performed *no* services for her, the $5,000 is *per se* unreasonable without the court needing to determine whether the invoice is admissible.

Finally, Mrs. Suh charged Mr. Daniels with malpractice in the Philadelphia Actions, but after the case was dismissed for lack of subject matter jurisdiction, she did not pursue him or his firm in a court with appropriate jurisdiction,[23] which is another failure to mitigate.

Moreover, other than the fees and costs directly related to this Motion for Contempt, no damages will be awarded for any legal fees, costs or trustee commission as Mrs. Suh further failed to mitigate her damages by filing new bankruptcy cases instead of enforcing the 2010 Contempt Order in her First Chapter 13 Case. "The proper vehicle to enforce a court order is a motion in the original case." *In re Consol. Indus.*, 360 F.3d 712, 716 (7th Cir. 2004). *See also In re Sindram*, 08-00559, 2009 WL 361470, at *2 (Bankr. D.D.C. Feb. 6, 2009) (where case had not been closed only because of pending contempt motion, closing case in order to terminate the automatic stay but simultaneously reopening it to address the contempt motion). This obtains from the idea that "there is no such thing as an independent cause of action for civil contempt." *Hurst v. City of Dover*, CIV.04-083-GMS-LPS, 2008 WL 2486458, at *4 (D. Del. Apr. 17, 2008) (quoting *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993), which was quoting *Blalock v. United States*, 844 F.2d 1546, 1550 (11th Cir. 1988)). Rather, motions for contempt of a court order are extensions of the original action that resulted in that order, and therefore should be brought in the case in which the order was entered. *D. Patrick, Inc.*, 8 F.3d at 459. Certainly, in enforcing the discharge injunction—an order of the bankruptcy court—former debtors do not file new cases, but reopen their prior case to raise civil contempt against the alleged violators. *See, e.g., In re Caravona*, 347 B.R. 259, 270 (Bankr. N.D. Ohio 2006).[24]

Proceeding in this manner would have cost Mrs. Suh nothing by way of filing fees.[25] Had she so proceeded, no trustee would have been appointed, no stay would have arisen (similar to the situation had the state court found jurisdiction), no new plan would have been required, and she would not have incurred trustee commissions. She would have completely avoided Mr. Edelstein and Mr. Igwe. This would have been the proper course of action. The City will not pay for Mrs. Suh's procedural errors.

## C. Attorneys Fees and Costs

The first category of contested damages consists of the following attorneys fees and costs:

1. Fees for the Second Chapter 13 Case and Third Chapter 13 Case

Although the failure to mitigate alone supports not awarding the majority of Mrs. Suh's first category of contested damages, the court will address additional reasons argued by the parties. First, the fees, costs and trustee commissions of the Second Chapter 13 Case and Third Chapter

---

[23] Any statute of limitations issue might have been averted at the time of dismissal in Pennsylvania by a motion to remove the matter from the state to the federal court. *See* 28 U.S.C. § 1441.

[24] In this case, at this juncture, judicial economy dictates that the matter proceed as is.

[25] This court does not charge the $47 fee "[f]or filing any document that is not related to a pending case or proceeding. . . ." 28 U.S.C. § 1930, incorporating the Miscellaneous Fee Schedule, ¶ 7, to file a Motion for Contempt of a court order.

13 Case were not incurred in pursuit of recovering 2147, as Mrs. Suh claims, but were for general bankruptcy purposes. At the time she filed the Second Chapter 13 Case, Mrs. Suh did not know that the City had not returned the properties, thus it could not have been filed to obtain a return of 2147. She filed a plan to pay arrearages to a secured creditor and to pay taxes to the City over time. Her motion to compel turnover was filed almost a year and a half into the Second Chapter 13 Case. Thus it is more likely the Second Chapter 13 Case was necessary to address a secured claim and to pay taxes to prevent foreclosure by the City.

Second, as shown by her attorney's fee disclosure in the Second Chapter 13 Case, the fees she incurred were attributable to bankruptcy services, not the motion practice or adversary proceeding. Indeed, the testimony elicited from her own witness established that the law firm would have charged additional fees for matters outside the ordinary matters. Tr, pp. 82-83; Ex. D-25. No fee application was filed.

Third, in both bankruptcy cases, Mrs. Suh received and is receiving ordinary bankruptcy benefits for the attorney's fees, filing fee and trustee commissions that were not in service of getting the properties back, for example, in the form of an automatic stay and payment to creditors over time. Undoubtedly, the Third Chapter 13 Case is necessary for reasons other than pursuing the contempt motion, because as set forth above, the motion could have easily been brought in the First Chapter 13 Case and/or maybe the Second Chapter 13 Case. Thus she was not damaged as it pertains to reasonable fees charged for ordinary services in the Second Chapter 13 Case and Third Chapter 13 Case.

   2.  Mr. Edelstein's Fees

As for the purported $2,991.83 in connection with Mr. Edelstein's representation of her in the Philadelphia Actions, a party seeking reimbursement of attorney's fees has the burden to prove its payment and that the amount paid was reasonable. *In re Bain*, 527 F.2d 681, 685 (6th Cir. 1975); *Serna v. Law Office of Joseph Onwuteaka, PC*, 4:11-CV-3034, 2014 WL 3749652, at *3 (S.D. Tex. July 29, 2014) ("Serna, as the party seeking fees, has the burden to show the reasonableness of the hours billed and to prove his attorneys exercised 'billing judgment.'") (citing *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013)). Mrs. Suh did not meet this burden. She presented no actual proof of paying Mr. Edelstein anything.

Instead, Mrs. Suh asserted that Mr. Edelstein had sent her a past due notice. She did not offer that into evidence or present any other evidence that he was pressing her for payment to support that this is a real debt. Though she testified that she had a fee agreement with Mr. Edelstein, she did not submit any such agreement into evidence for the court to understand what she might be held liable for.

Mrs. Suh did seek to admit a document that she testified was an invoice from Mr. Edelstein for the work that he did. Tr, at 38. The City objected on the grounds that the invoice was not properly authenticated, and even if it were, it did not fit under the business record exception to the hearsay rule. The court reserved on the issue. Tr, at 41-43. While the court now finds that the document was authenticated, it also finds that it contains inadmissible hearsay and in any case, does not serve to prove that Mrs. Suh was damaged in the amount of $2,991.83.

Documents must be authenticated by testimony of a witness with knowledge. Fed. R. Evid. 901(b)(1). "Ordinarily, the necessary authentication for documents will be provided by direct testimony, such as from the author, recipient or custodian of the document." 3 Federal Evidence Practice Guide § 15.04[19] (Matthew Bender 2017). *See Villar v. City of New York*, 09-CV-7400 (DAB), 2017 WL 4512507, at *5 (S.D.N.Y. Sept. 25, 2017) (business record can be authenticated by recipient of document as a document that was received by her); *Beard v. Ocwen Loan Servicing, LLC*, 1:14-CV-1162, 2016 WL 4271765, at *6 (M.D. Pa. Aug. 15, 2016) ("As the paying client, Plaintiff can authenticate documents detailing the attorneys' fees she incurred."); *Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 614 F. Supp. 2d 481, 484 (S.D.N.Y. 2009) ("So, again, it was plaintiffs' burden to adduce admissible evidence sufficient to show that the exhibits are reasonably likely to be what they purport to be — true copies of originals actually written by Chenery and received by Mr. Carroll."); *Harris v. Jamaica Auto Repair Inc.*, 03-CV-417 (ERK), 2009 WL 2242355, at *3 (E.D.N.Y. July 27, 2009) (stating that if the plaintiff testified that she received the repair bills in question that would be "sufficient for a jury to determine that the invoices for repairs are what plaintiff claims them to be."). Mrs. Suh credibly testified that she received the document from Mr. Edelstein.

~~But authentication does not end the inquiry. For the court to consider the facts reflected by the document, its admission must not violate the rule against hearsay. Fed. R. Evid. 802. The City~~ argues, and the court agrees, that the invoice does not fit under the exception against hearsay for records of a regularly conducted activity, i.e., business documents. *See* Fed. R. Evid. 803(b)(6). That exception requires, among other things, the testimony of a custodian or other qualified witness that the record was made at or near the time by someone with knowledge, was kept in the course of a regularly conducted activity of the business, and making the record was a regular practice of that activity. Fed. R. Evid. 803(b)(6)(A)-(D). *See Harris v. Jamaica Auto Repair Inc.*, 2009 WL 2242355, at *3. Nobody from the Edelstein law firm testified in this case.

But in her post-trial brief, Mrs. Suh argued that she did not need the business document exception for the court to admit the document. Instead, she offers it "simply for the fact that it states particular amounts and thereby substantiates Mrs. Suh's testimony as to the attorney fees incurred." Doc. No. 55, p. 8 n. 2. She cites in support *In re 3RC Mech. & Contracting Servs., LLC*, 502 B.R. 548, 552 (Bankr. N.D. Ill. 2013):

> A statement is not hearsay where offered to show its effect on the witness. *U.S. v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002). "The hearsay rule thus is not violated where invoices are admitted not for their truth but simply for the fact that they state particular amounts and thereby substantiate an individual's testimony as to how much was paid for a specific service or item." *Harris v. Jamaica Auto Repair Inc.*, 03-cv-417, 2009 WL 2242355, at *1 (E.D.N.Y. July 27, 2009) (internal quotation omitted).

Thus the document may only substantiate the amount Mrs. Suh contends she owes Mr. Edelstein for his services, but is not admissible to prove that the services were necessary or the amount charged reasonable. That Mr. Edelstein filed in the wrong court—twice—and lost both times, suggests that any amount charged was excessive. *See SCS Commc'ns, Inc. v. Herrick Co.*,

360 F.3d 329, 344-45 (2d Cir. 2004) ("SCS was free to challenge the reliability of the note, to minimize its importance, and to offer alternative understandings of its meaning; but these and other challenges 'go to the weight to be given to the [evidence] by the jury, not to [its] admissibility.'").

Moreover, the document does not supports Mrs. Suh's claim. Rather than being called an "invoice," it is labelled "Draft Statement."

Below "Draft Statement" are two lines as follows:

> Okay to Bill; Your Initials Please: _____
> Hold, Do not Bill: _____

Ex. D-28. Neither line is initialed. It discloses two hours of attorney work, performed by "Scott Wolf," not Mr. Edelstein, at a rate of "$0.00," and only covers work performed between October 29, 2014 and November 24, 2014. *Id.*[26] In addition, the document is dated August 28, 2017—just prior to the first hearing in this matter—leading the court to wonder whether, on Mrs. Suh's request in connection with the present litigation, Mr. Edelstein merely printed out a document reflecting the costs to his firm for handling the Philadelphia Actions *pro bono* (the expenses did run from June 24, 2014 to March 17, 2015, consistent with the Philadelphia litigation), as Mrs. Suh testified that Mr. Edelstein was doing her and her husband a favor, as a friend of Mr. Suh. In fact, the document is addressed to Mr. Suh, so if a bill, it is not Mrs. Suh's debt and therefore not her damages. Certainly, if Mr. Edelstein intended to bill the Suhs, an invoice would have been finalized by August 2017. The court imagines that the email referenced by Mrs. Suh, allegedly stating that her account is past due and yet not offered into evidence, was actually this same document.

A contempt fine "must be based upon evidence of complainant's actual loss." *McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 87 (3d Cir. 1984). This document does not prove that loss.

Finally, Ms. Kasen's e-filing on February 20, 2018 of a proof of claim signed by Mr. Edelstein and attaching this document does not change this court's opinion of the document. As stated above, this court may take judicial notice of a debtor's schedules so long as it does not consider them probative as to a fact at issue. Clearly the filing of the claim is meant to evidence that this is a valid pre-petition debt, thus the court may not make that finding based on this *post hoc* event. The court notes, however, presumably Mrs. Suh filed her bankruptcy case in good faith with the intent to obtain a discharge. Thus, to the extent it is a valid prepetition unsecured debt, it may be discharged in this case upon completion of Mrs. Suh's chapter 13 plan. Thus, even had the court decided Mrs. Suh owes Mr. Edelstein $2,991.83, it is not an actual damage if Mrs. Suh discharges her personal liability. At best, the damage is premature at this time.

---

[26] The work included 0.40 hours in phone calls with "Ori Feibush" regarding 2147 and 2149. As Mr. Feibush, identified by Mrs. Suh as the person behind 2149 Properties, LLC, was not a party to the lawsuit, the court wonders what this communication had to do with the lawsuit. *Id.* Though Mr. Edelstein assisted the Suhs in selling 2149, it had been sold in August 2013, more than a year prior to the time of Mr. Wolf's phone calls.

This court finds that Mrs. Suh failed to prove by a preponderance of the evidence that she suffered any damage in connection with Mr. Edelstein's representation of her and her husband in state court. Accordingly, the court will not award any of the Edelstein Firm fees and costs to Mrs. Suh as damages.

### 3. Kasen & Kasen's Fees and Costs

The final category of attorney's fees and costs sought concern Mrs. Suh's attorney in this bankruptcy case. Though the court reserved on this issue, *see* Tr, p. 168, and will allow the parties to further brief the issue, it has a few comments on items the parties should address.

The parties concede that contempt damages may include an award of attorneys' fees incurred in connection with the contempt proceedings. To that end, Mrs. Suh negotiated an attorneys fee in connection with "all aspects of the bankruptcy case" as "$3,500 plus 30% of all money or property recovered/awarded/promised/paid by way of settlement." *See* Doc. No. 9, Disclosure of Compensation of Attorney for Debtor(s). Thus, under the unequivocal language of their agreement with Mrs. Suh, Kasen & Kasen's fees are capped at the $3,500 amount plus 30% of any amount awarded.[27] As the court understands it, this is true even if fees at an hourly rate would have exceeded the percentage provided. That is the risk of taking a matter on a contingency fee basis. So, assuming she was awarded all of her requested damages, Mrs. Suh claimed that the amount for attorneys fees in this case would be fixed at $56,528.56.[28]

At the hearing, the City raised the question of how the 30 percent is applied. Tr, pp. 164-65. For example, if the other damages totaled $100,000, would $30,000 of that be payable to Mrs. Suh's attorney and $70,000 to Mrs. Suh, or would the attorney receive $30,000 and Mrs. Suh $100,000? Naturally, the court is also curious how this fee arrangement is supposed to work. Certainly, the first option ($70,000 to Mrs. Suh and $30,000 to Kasen & Kasen) falls in line with the customary understanding of how a contingency fee works. As read, the clear language of the fee agreement can be construed as an agreement between Mrs. Suh and Kasen & Kasen limiting recovery of the contingency fee solely to a percentage of the actual amount awarded and not in addition to the amount rewarded. It might be argued that limitation to the amount awarded is the effect of the precise deal made between the parties: in other words, Mrs. Suh expected to receive an amount and that amount would be reduced by 30%. While making a party whole is a goal of contempt damages, perhaps those damages can be curtailed due to the parties' own agreement on the amount of recovery. Unfortunately, the parties' submissions are not helpful and the court has been unable to uncover any statutes or cases to assist it in this regard. Thus, it will allow the parties to address the issue in a separate submission.

In addition, the court notes that while trustees and committees are expressly authorized to employ professionals on a contingency fee basis, 11 U.S.C. § 328(a), it is not clear whether this

---

[27] There may be a question of whether costs are recoverable in addition to the 30% as the agreement is silent.

[28] This number would have to include and/or absorb the fees referred to in the supplemental brief filed by Mrs. Suh. Doc. No. 55, p. 4 n.1.

applies to chapter 13 debtor's attorneys, as professionals not employed pursuant to section 328. Moreover, section 328 suggests that pre-approval by the court of a contingency fee agreement is necessary. In searching for cases involving debtor's attorneys being paid on contingency, the court found only special counsel being paid this way.[29] *See, e.g., In re Mkt. Ctr. E. Retail Prop., Inc.,* 730 F.3d 1239 (10th Cir. 2013) (involving special counsel to chapter 11 debtor); *In re Airspect Air, Inc.,* 385 F.3d 915 (6th Cir. 2004) (special counsel employed for breach of contract action); *In re Knudsen Bros. Dairy, Inc.,* 24 B.R. 418 (Bankr. D. Conn. 1982) (debtor's prepetition counsel retained to continue litigating lawsuit). The case cited by Mrs. Suh in support of a contingency fee is inapposite as applying to state, not federal bankruptcy, courts. *See Distefano v. Greenstone,* 357 N.J. Super. 352, 354 (App. Div. 2003) (state court case allowing as damages contingency fee incurred in malpractice action).

Even then, contingency fees are subject to review for reasonableness. *See* 11 U.S.C. § 328(a) (counsel can be retained on "any reasonable terms and conditions of employment"). Also pursuant to 11 U.S.C. § 329, a bankruptcy court may cancel a fee agreement if the compensation exceeds the reasonable value of services, and reasonableness is determined by a lodestar analysis. *In re Sundquist,* 576 B.R. 858, 876 (Bankr. E.D. Cal. 2017); *In re Mkt. Ctr. E. Retail Prop., Inc.,* 730 F.3d 1239 (10th Cir. 2013) (reversing and remanding to bankruptcy court consideration of section 330(a)(3) factors in awarding fees to special counsel to chapter 11 debtor that had accepted agreement to be paid under hybrid contingency and hourly compensation arrangement). *See* 11 U.S.C. § 330(a)(4)(B) ("In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section."). That said:

> Use of a contingency fee by a debtor and his or her attorney is not *per se* unreasonable. *See Yermakov v. Fitzsimmons (In re Yermakov),* 718 F.2d 1465, 1470 (9th Cir. 1983) (noting that "nothing inherent in a contingency fee agreement between a debtor and his [prepetition] attorney prevents it from being enforceable in bankruptcy."). However, neither is a contingency fee *per se* reasonable. Instead, the fee paid to a debtor's attorney, whether through a contingency fee or a[n] hourly fee, must reflect the reasonable value for the attorney's services. *Id.* at 1470-71; *see also* I.R.P.C. 1.5 cmt. 3; § 329(b). If the compensation exceeds the reasonable value of the services rendered, the Court may cancel the parties' agreement and order any excess, unreasonable payment disgorged. *See* § 329(b); *In re Soderberg,* 99.4 I.B.C.R. 152, 153 (Bankr. D. Idaho 1999).

*In re Jones,* 356 B.R. 39, 49 (Bankr. D. Idaho 2005) (footnote omitted) (cancelling 75% contingency fee arrangement in automatic stay litigation as promoting litigation and putting counsel's economic interest ahead of the client's interests). Finally,

---

[29] To be sure, this court has *never* seen any case where a debtor's primary bankruptcy counsel represented him or her on a contingency fee basis.

> "[I]t is within the court's inherent power of supervision over the bar
> to examine the attorney's fee for conformance with the reasonable
> standard of the Code of Ethics." *Rosquist*, 692 F.2d at 1111; *accord
> Allen v. United States*, 606 F.2d 432 (4th Cir. 1979); *In re
> Michaelson*, 511 F.2d 882, 888 (9th Cir. 1979); *Schlesinger v.
> Teitlebaum*, 475 F.2d 137, 141 (3d Cir.), *cert. denied*, 414 U.S.
> 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973); *Farmington Dowel
> Prod. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90–91 (1st Cir. 1970);
> *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir. 1970). It is also
> within the inherent *equitable* powers of a federal court to review the
> reasonableness of attorneys' fees under contingent fee contracts.
> *E.g., Krause v. Rhodes*, 640 F.2d 214, 218 (6th Cir.), *cert. denied*,
> 454 U.S. 836, 102 S. Ct. 140, 70 L.Ed.2d 117 (1981). While a
> contingency fee may have been reasonable when the contract was
> signed, intervening circumstances can render a reasonable contract
> "unfair in its enforcement." *Id.* at 220; *accord McKenzie Constr. Co.
> v. Maynard*, 758 F.2d 97, 101 (3d Cir. 1985). Moreover, the fact that
> a client is willing to abide by the fee agreement is not dispositive
> "for the object of the court's concern is not only a particular party
> but the conformance of the legal profession to its own high standards
> of fairness." *Rosquist*, 692 F.2d at 1111 (*quoting Farmington*, 421
> F.2d at 90 n. 62).

*In re A.H. Robins Co., Inc.*, 182 B.R. 128, 136 (Bankr. E.D. Va. 1995), *aff'd*, 86 F.3d 364 (4th
Cir. 1996).

Regarding the fees Mrs. Suh anticipates incurring to Kasen & Kasen in the Quiet Title
Action, Mrs. Suh in a footnote stated that these "prospective attorney fees . . . will *necessarily* be
incurred to bring the 2016 State Court Action to conclusion." Doc. No. 55, p. 4 n. 1. At one time,
she estimated the fees and costs would be $20,000. Doc. No. 18, p. 8. But she presumably is
reserving argument on this issue until the exact amount is known. While the City had conceded
the fees and costs incurred so far, as to prospective fees it argues that Mrs. Suh will be made whole
by recovering the value of 2147, and thus will not need to continue to defend the Quiet Title Action.
Doc. No. 56, pp. 21-22. With this, the court agrees. If Mrs. Suh is made whole, it is inconceivable
how and why the Quiet Title action would or could proceed and how Mrs. Suh would incur any
additional fees especially where Mrs. Suh, through her counsel, has admitted that recovery in the
Quiet Title Action now "is speculative at best." Tr, p.12.

This court may only award reasonable fees. In addition, a contempt award for fees and
costs must relate to damages caused by the contempt. *Institute for Motivational Living, Inc. v.
Doulos Institute for Strategic Consulting, Inc.*, 110 Fed. Appx. 283, 289 (3d Cir. 2004). There can
be no recovery for items not related to the contempt. Accordingly, the court will reserve on the
issues raised in this section of this Memorandum Decision and allow the parties to argue their
positions. Kasen & Kasen may file an updated fee application and address it, together with the
concerns raised in this section, in a separate memorandum of law to which the City may respond.

**E. Lost Bulk Sale Opportunity**

The second category of contested damages consists of Lost Bulk Sale Opportunity (and the costs associated therewith) as follows:

| | |
|---|---|
| $68,907.00 | Lost Bulk Sale Opportunity |
| 8,341.25 | Valbridge Expert Fees to November 6, 2017 |
| 1,890.00 | Valbridge Expert Fees for November 7, 2017 hearing |
| $79,138.25 | |

As explained above, the Valbridge report assumed that Mrs. Suh would sell a subdivided 2149 together with 2145 and 2147 on April 26, 2017.[30] Thus, in addition to the $85,000 conceded by the City to be due for 2147, Mrs. Suh alleged that she would also be entitled to $68,967 (correctly calculated as $68,907) related to Lost Bulk Sale Opportunity, plus the expert fees of her appraiser to estimate this Lost Bulk Sale Opportunity value and to testify in court.

Courts have found that lost opportunity is a compensatory damage that can be awarded as a result of a party's contempt. *In re Workman*, 392 B.R. 189, 195 (Bankr. D.S.C. 2007) (plaintiffs entitled to compensatory damages for lost opportunity to refinance their home); *In re MD Promenade, Inc.*, No. 08-34113-SGJ-7, 2009 WL 80203, at *13, *15 (Bankr. N.D. Tex. Jan. 8, 2009) (as a result of contempt of court's order, party was damaged by, *inter alia*, a lost opportunity to market property); *In re Mocella*, 552 B.R. 706, 723 (Bankr. N.D. Ohio 2016) (recognizing that lost opportunity to obtain new vehicle is a recoverable damage but ultimately concluding that party failed to prove damages); *In re Xavier's of Beville, Inc.*, 172 B.R. 667, B.R.672 (Bankr. M.D. Fla. 1994) (recognizing that lost opportunity to reorganize is a recoverable damage but ultimately concluding that party failed to prove damages). Lost opportunity costs represent real economic damage. *Matter of Kennedy*, 181 B.R. 418, 420 (Bankr. D. Neb. 1995); *Matter of Fern Acres, Ltd.*, 180 B.R. 554, 557 (Bankr. D. Neb. 1995). Therefore, it is entirely appropriate for the court to consider Mrs. Suh's claim for her Lost Bulk Sale Opportunity and the costs associated therewith as a compensatory damage for the City's contempt. And while the court has been unable to uncover a precise formula to determine such damages, what is clear is that any determination of damage must be supported by the evidence produced.

1. Lost Bulk Sale Opportunity

The City rejects the Lost Bulk Sale Opportunity damage in its entirety. It argues that Mrs. Suh already received the value she was due from the sales of 2145 and 2149. Doc. No. 56, p. 20. It then argues that the calculation of the Lost Bulk Sale Opportunity value was not supported by evidence. *Id.* In general, it contends that any cost savings in developing contiguous lots accrues to the developer, not the seller of the lots. *Id.*, at 21. It also points out that Mrs. Suh's appraiser did

---

[30] Though at the hearing, the City questioned on what basis Mr. Lukens made this assumption, Tr, pp. 111-13, as neither party explained or questioned the postpetition effective date of the appraisal, the court will consider that point conceded. The City's footnote, Doc. No. 56, p. 21, n. 15, suggesting that if the court accepted the 20 percent premium argument, then it should apply it against the actual amounts Mrs. Suh sold 2145 and 2149 for, untenably mixes values from 2013, 2016 and 2017 together.

not specifically identify where he got 20% from, just that he talked to some developers: this is not enough, it claims. *Id.*

Although her testimony was confusing at times, the court finds that Mrs. Suh credibly testified, even in response to cross-examination, that she and her family always treated the separate properties as one and that they would sell or develop the properties as one. And although the City elicited testimony from Mrs. Suh that she attempted to sell the properties separately, the City was not successful in challenging Mrs. Suh's statement about her intention regarding selling the properties as one. The testimony elicited reflects that Mrs. Suh is unsophisticated and may have had ineffective professionals assisting her. The court believes her when she states that she panicked as a result of the City's actions against 2147. The court believes that Mrs. Suh held on to 2145 and 2149 as long as she could in hopes of having 2147 returned to her. The court finds Mrs. Suh credible in her statements that she was forced to sell off 2145 and 2149 to address financial situations.

The court also finds that Mrs. Suh sufficiently proved that she would have been able to sell the lots together for more than selling them individually. The court begins with the well-established premise that

> . . . '[f]air market value is the price at which . . . property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.'"
> *Amerada Hess Corp. v. C.I.R.*, 517 F.2d 75, 83 (3d Cir. 1975) (quoting *United States v. Cartwright*, 411 U.S. 546, 551, 93 S. Ct. 1713, 36 L.Ed.2d 528 (1973)).

*United States v. Nagle*, 664 Fed. Appx. 212, 215-16 (3d Cir. 2016), *cert. denied,* 137 S. Ct. 1831 (2017).

The court understands that if a buyer could develop contiguous properties for 20 percent less than individually, it would not obliterate that savings—additional profit, really—by paying 20 percent more for them. Unless there is competition for the lots. Then a buyer would need to pay more for contiguous lots to make the same profit that it would obtain if buying the lots individually. *See* Tr, p. 108 ("LUKENS: And if you can reduce your cost, and in this case you can reduce your cost by doing the four consecutive lots, you can pay more for the land. And they do pay more for the land, because there's more competition for it.").

The Valbridge Report and Mr. Lukens supported the theory that competition was sufficient in Point Breeze that potential purchasers would compete for these contiguous parcels. Both demonstrated a growing population, increase in new construction, and gentrification of the neighborhood. The Valbridge Report noted the "steady increase of new construction and home prices," supported by the statistics on new construction in the neighborhood. Mr. Lukens credibly testified that Point Breeze has ". . . become a very desirable place to live." In such a seller's market, defined as "[a]n active market in which the sellers of available properties can obtain higher prices than those obtainable in the immediately preceding period; a market in which a few available properties are demanded at prevailing prices by many users and potential users." *The Appraisal of*

*Real Estate*, p. 306 (14th ed. 2013)[31]), Mrs. Suh could obtain a higher price for the parcels. The City did not dispute this characterization of Point Breeze.

That the Valbridge Report did not list the developers that Mr. Lukens spoke with to get his 20 percent estimate is of no matter. *The Appraisal of Real Estate* explains that what an appraiser includes in a report depends upon the client's needs, i.e., a short form report when "the client [wants to] make an initial decision about a possible real estate transaction," possibly with a longer, more detailed report provided later. *The Appraisal of Real Estate*, p. 651. Either way, the appraiser must keep documentation supporting conclusions.

> . . . [T]he appraiser must undertake the analysis required by the assignment as established by the scope of work. In such a case, the appraiser keeps all necessary material, research data, and documents used to prepare the appraisal in the appraiser's workfile. Although appraisers may never need to provide written substantiation for value opinions that are submitted in abbreviated form, they may be asked to explain or defend their opinions at a later time.

> The extent of workfile documentation depends on the type of report that is appropriate for the scope of work of the assignment. A less detailed report will require more workfile documentation, while a more detailed report will require little external documentation.

*Id.*

Thus, the Valbridge Report is not deficient in failing to list the developers or provide cost estimates in the appraisal. The City was free to question the Valbridge sources on cross of Mr. Lukens. *See* Fed. R. Evid. 703.

Finally, the valuing approach Mr. Hughes advocated—adding up the cost to develop, plus the expected profit, and making that the value of the property—is simply one element of the Cost Approach to valuation. *See The Appraisal of Real Estate*, p. 569. This "entrepreneurial incentive" is calculated by subtracting the total cost of development from the market value to come up with a profit or loss. *Id.*, p. 573.

But the Cost Approach is not necessarily the better approach to valuation. *The Appraisal of Real Estate* suggests that while it "may have an advantage over the sales comparison and income capitalization approaches when reliable data on comparable sales and rents is scarce, that same lack of data can weaken the credibility of the estimate of land value that is an essential step in the application of the cost approach." *Id.*, p. 568. *See In re Diamond Beach VP, LP*, 551 B.R. 590, 604 (S.D. Tex. 2016), *appeal dismissed* (Aug. 5, 2016) ("The Fifth Circuit has found that the cost

---

[31] *See Textron Fin.-New Jersey Inc. v. Herring Land Grp., LLC*, CIV.A. 06-2585 MLC, 2011 WL 2600749, at *10 (D.N.J. June 29, 2011) (referring to *The Appraisal of Real Estate* as the "Appraiser's Handbook" or the "Appraiser's Bible."); *BASF Corp. Coating & Ink Div. v. Belvidere Town*, 23 N.J. Tax 551, 574 (2007) (rejecting appraiser's analysis as not being consistent with methodology set forth in *The Appraisal of Real Estate*). *See also CSX Transp., Inc. v. Georgia State Bd. of Equalization*, 552 U.S. 9, 17 (2007) (citing *The Appraisal of Real Estate*).

approach can overstate value."); *In re Mocco*, 222 B.R. 440, 470 (Bankr. D.N.J. 1998) (stating that the New Jersey courts have accepted the cost approach "where the property is a specialty or unique property for which there is no market data," when there is no testimony on any other methodology, and when "the most reliable testimony was that involving the cost approach."). Moreover, it may not be applicable to valuing vacant property. *The Appraisal of Real Estate*, p. 561.

The court accepts the values, including the Lost Bulk Sale Opportunity value, estimated by Mrs. Suh's expert. Mrs. Suh has met her burden of proof and has been able to quantify damages in the amount of $68,907 as a result of the Lost Bulk Sale Opportunity.

2.  Cost of Appraisal

Though the City does not contest the amounts alleged due to Valbridge for its services, it does question whether the full amount is appropriately awarded. It argues that at minimum $6,000 should be subtracted from the expert fees as the amount Valbridge charged for an expert report it later revised or withdrew. Doc. No. 56, p. 12. ; *see* Tr, p. 103. It states that Valbridge removed a lost profits analysis from that report and corrected several value scenarios that were either inappropriate or not well supported. *Id.* Thus, the $6,000 cost to prepare that first report should be subtracted from the full fee of $8,341.25. *Id.* This would leave the $2,341.25 charged for the revision.

But Mr. Lukens testified credibly the original report was not so much withdrawn as it was revised. The revision encompassed removing a lost profits analysis, a section on developer's profit or entrepreneurial incentive, and two comparable sales, yet retained the appraisal of the three lots individually and clarified the Lost Bulk Sale Opportunity damages.

The court finds that the cost of the appraisal is part of the actual damages to be assessed against the City as part of the cost of litigation. It will not deduct $6,000 from that amount because that would be 100 percent of the initial cost, when much of the original report apparently was retained.

Accordingly, the $8,341.25 for the appraisal will be included in the actual damages. As the City did not contest the $1,890 in expert testimony fees, and expert testimony fees are a reasonable part of actual damages, *see, e.g. Sayre v. Customers Bank*, CV 14-3740, 2017 WL 2439551, at *11 (E.D. Pa. June 6, 2017), *appeal dismissed,* 17-2401, 2017 WL 6606813 (3d Cir. Sept. 20, 2017); *In re Landmark Distributors, Inc.*, 195 B.R. 837, 852 (Bankr. D.N.J. 1996), those fees will also be included in the actual damages.

## CONCLUSION

Mrs. Suh has produced evidence of actual loss warranting an award of damages to restore her to the position she would have held but for the City's contempt – in other words, to make her whole. Accordingly, the court will initially award $173,328.64 in damages[32] representing:

| | |
|---|---|
| $ 9,190.39 | Kasen fees in Quiet Title Action[33] |
| $85,000.00 | Value of 2147 |
| $68,907.00 | Lost Bulk Sale Opportunity |
| $ 8,341.25 | Valbridge Expert Fees to November 6, 2017 |
| $ 1,890.00 | Valbridge Expert Fees for November 7, 2017 hearing |

A further hearing will be held regarding Kasen & Kasen's fees and costs.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: May 4, 2018

---

[32] Note that the damages award might be property of the estate payable to Mrs. Suh's creditors. 11 U.S.C. § 1306(a)(1). *See also* 11 U.S.C. § 1307(c) (conversion or dismissal of a chapter 13 case for cause determined by the best interest of creditors and the estate).

[33] Because the court is making Mrs. Suh whole by way of monetary compensation, it would be unreasonable for Mrs. Suh to incur any further fees or costs associated with the Quiet Title Action.